All right, the next case is Donald Dobson versus the Secretary of Health and Human Services. I see Mr. Chin on the line, Julius Chin for the appellant Dobson. I do not see Ms. Lopez, Carolyn Lopez for the Secretary of Health and Human Services. Is she? Can you hear me? I can see all of you on the screen and I can see myself on the screen. Okay, there you are. I see you now, Ms. Lopez. Good morning. Good morning. Good morning, Mr. Chin. Good morning, Your Honors. You may proceed with your argument. Thank you. May it please the Court, Julius Chin for appellant Donald Dobson. After being crushed against a wall over a decade ago, Mr. Dobson developed debilitating nausea and vomiting related to eagle and central cord syndromes, a crippling sensation he describes as having a finger down his throat 24 hours a day. Those symptoms proved intractable against four conventional treatments, which at times increased Mr. Dobson's already high risk of serious medical complications. Thus, as a final option, his doctors tried dronabinol, which completely alleviated his nausea and vomiting. It should be no surprise that dronabinol had that life-altering effect. The drug dexcompendium at issue here recognizes that one medically accepted use is to treat nausea and vomiting that is disease-related and treatment refractory. As the supporting case study from the Journal of Pain and Symptom Management confirms, dronabinol provided total relief to a cancer patient whose nausea and vomiting persisted after taking a combination of anti-emetic drugs. Dronabinol did so- Mr. Dobson doesn't have metastatic cancer, though. So, I mean, it seems as if the committee decided that he has a different disease. He has the same symptoms, but a different disease. And so Medicare law is pretty complex. Why shouldn't we decide that the appeals council, based on the complexity of Medicare law and the fact that they live to the relevant compendia, that they're better situated than we are to determine whether or not this is a prescription that ought to be covered by Medicare Part D? Thank you for that question, Your Honor. There's a lot in that. And so let me start with what the council did. We would disagree that the council did what the Medicare law actually requires here. This is the supported by standard. Because even the government itself, in its appeal brief, and indeed the council, says that you need to take a that is the baseline. And we agree that that is what the statutory standard is to begin with. You can look at the board statement, or I'm sorry, the council statement record on Appeal 9, where it says that the inquiry must be based on the entirety of the drug dex citation. The title must be read with its content. And the government tells us here that the entry must be taken as a whole, read carefully and thoroughly with an analysis of the entire entry. And here, we think the government has instead done is completely inconsistent with that. It has focused on a disease. And it has said, as a legal matter, we think the council's decision is quite clear that as a legal matter, it is saying that the Medicare standard requires the disease to match here. And we just don't think that that is supported by the statute. As I've already said, the government says this is supposed to be a holistic approach. A categorical rule that says the disease is the linchpin of the inquiry is not a holistic approach. In fact, it is the opposite of a holistic approach. Now, the government, so what we think the government has done at bottom here is to actually short circuit any factual inquiry here, the holistic inquiry of the type that it describes in its brief. And I think if you want to compare what the government does in its brief starting at page 20, in its affirmative argument, this is the part one of its argument, it goes through a list of things that it says that the council actually considered, including the efficacy rating and various other factors, but it centers really on the disease and says it comes down to the disease. And that is really not at all what the council did here. So we think that there is a clear disconnect as a legal matter to start with. And at the very least, we think that Mr. Dobson should be entitled to a remand for the council to actually conduct the inquiry under the holistic approach, the legal rule that everybody actually agrees on here. Now, if the council does that, are you saying that anyone who has nausea and vomiting is entitled to have the drug covered by Medicare Part D regardless of regardless of the disease, as long as they have that symptom, they get the they get the drug covered by Medicare Part D? No, Your Honor, we're not saying that at all. What we are saying is that it needs to be supported by and I think the difference here is that first, you would have to have nausea and vomiting. Those are two separate symptoms. As the case study suggests, drugs could resolve one without the other. It would have to be disease related, as you point out. But more importantly, it would have to be treatment refractory as well. And if they meet those criteria, we think that the citation reasonably read, really the only reasonable reading here would be that it would have to support the use then. It is written broadly, yes, but that is because that is the nature of the use here. And so and I'm happy to walk the court through exactly why we think that is the only reasonable reading of a citation here. You can start with the title, as I've just explained. You need nausea and vomiting that is disease related and treatment refractory. Even the council says on its face, that title provides support for Dobson's use of dronabinol. That's at record on appeal. Now, more importantly than the title, and I want to be very clear here, we are not just relying on the title. We think that the only reasonable holistic reading is that Mr. Dobson's use is supported by the citation. So moving on to what the government calls the content here, you can start with the context of the case study that is described in the citation itself. It is a study from the Journal of Pain and Symptom Management. And it is in a section, it appears in a section of the journal called Palliative Care Rounds. And so I think the context, it's very much setting the stage. This journal is talking about the management of symptoms and palliative care. The first sentence of the citation itself, where it describes the study, says that dronabinol produced resolution of refractory nausea and vomiting. It doesn't say anything about the disease. Moving on to the discussion, yes, there is discussion, sure, of a specific cancer here. There is a medical history, as you would probably expect there to be in the first instance. Patient presented in this way had these symptoms. But about halfway through, when you look at the entry, and just to orient the court, I'm on Record on Appeal 241, oh, I'm sorry, 243. It says 4NV. NV stands for nausea and vomiting as a shorthand. It says 4NV. Then it talks about the ineffective therapy that was tried on this patient. And then it later talks about how when dronabinol was added to the treatment, it resolved the symptoms within a matter of days. Now, the only court that has actually looked at this question has actually read it the exact same way, sensibly, because- I'm sorry to interrupt, but let me ask you a question. And maybe I just don't have a good understanding of this, but excuse me. Doesn't each one of these citations have to be supported by some type of a study in order to make it in there? That's correct, Your Honor. Yes. Okay. And so the mere fact that it's supported by a study, it's your position that the mere fact that it's supported by a study doesn't necessarily in and of itself limit itself to the use in that particular study? Because in this case, it was just one patient who was studied, right? Yes, Your Honor. What we are asking the court to do is exactly, again, what the government I think is suggesting. You look at it holistically. You don't just take the disease and say, as a legal rule, we think, which they've grounded in the statute. If you look at their brief on page 20, they say that the importance of the disease and condition is drawn from the statute. And so once you take that aside and say, well, let's look at this holistically, we think the only reasonable reading is to say, look, yes, we, of course, we're not disagreeing that the study itself concerned a specific type of cancer. But when you look at the compendium entry holistically, you have both the title and more importantly, the context. Again, the description itself doesn't suggest anything of the nature that there would be. But I'm looking at page eight of the Appeals Council's decision, and it appears to also focus on the fact that Dobson doesn't have post-operative nausea and vomiting. I'm reading it says, although medical records show that the appellant underwent operations as late as December of 2010, they did not demonstrate that the appellant's nausea and vomiting are directly related to an operation or post-operative in nature. And then later on, it says treatment and prophylaxis does not support the appellant's use of dronabinol. So I mean, they focus on more than just the disease itself. I mean, you say it's got to be a holistic determination. Doesn't that support the fact that the Appeals Council did conduct a holistic evaluation and analysis? No, your honor, we would disagree with that. And just to be clear, that is a separate compendium entry for prophylaxis and treatment of post-operative nausea and vomiting. And that is something that Mr. Dobson had argued earlier in the process, but is not pressing. So we are now focused just on the nausea and vomiting disease-related treatment refractory. And with respect to that analysis, the only thing that the Council says at ROA-9 and ROA-10, it very clearly says we restrict this reading of the citation only to say that it is supportive of treatment of nausea and vomiting related to metastatic cancer of the gastrointestinal mucosa. And then later on in ROA-10, it again repeats it in legal language. It says, we do not accept that a coverage determination involving the medically accepted indication standard can turn on an enrollee's symptoms alone. So we think it is very much trying to impose a legal rule here. It in fact told the district court this in the transcript. This is document 38, page 27, where the government was asked, is it your position that it has to match this exact cancer? And the government says, yes, that is our position. It could not be any other cancer. And again, we think when you look at this holistically, there is no indication that the cancer is being cured or that the cancer is really relevant. It is just medical history. We know from the Tangny case, it spells out exactly why. Dronabinol works on brain receptors. It has nothing to do with cancer. It inhibits the vomiting center in the medulla. And here, just to wrap up my opening, we think that Mr. Dobson's symptoms match exactly. There's no dispute about that. And in the end, all of the indications, when you take away this idea that the disease does not match, there really is no reason to think that Dronabinol would not work for Mr. Dobson. And so we think the citation taken as a whole very much supports his use. All right. Thank you, counsel. We'll hear from Ms. Lopez on behalf of the appellee. May it please the court, Carolyn Lopez, on behalf of the government. I want to just sort of make sure that we're all talking about the same framework here, which is that as your honor began, what's really at issue is HHS's technical determination that read as a whole a particular drug dex citation whose summary and description in the four corners of the citation. And I want to start off with the four corners of citation before getting to the study, because I think it's really important to understand that the statutory standard refers to whether something is supported by a particular medical compendium citation and not sort of what a, you know, individual treating doctor might personally think a study underlying such citation, but not necessarily incorporated into the citation means. And here, as HHS explained, at AR 9 through 10, that case itself, both the substantive summary and the case description that was incorporated in the citation are very specifically limited to the use of dronabinol to a patient who had intractable nausea and vomiting related to metastatic cancer of the gastrointestinal mucosa. And in that context, in this case-by-case judgment call, which is a technical decision, and I'll just point out that that was reached after four layers of administrative review, which is how Congress has instructed and delegated to HHS to make this determination. Council, I'm sorry to interrupt, but I want to get back to what you said a moment ago. You said, and I think that the Appeals Council decision says, although I think there's been a little bit of broadening on or attempts to broaden on appeal, that the citation supports the use only in association with metastatic cancer of the gastrointestinal mucosa. And first of all, I want to just make sure that's what you're arguing. And that's what you all argued below. So, yes, Your Honor, but I just want to make sure that I'm sort of giving the full context. So, yes, Your Honor, HHS's reading of the citation is that because this citation is very narrowly focused, what it surely doesn't mean is that, and it, you know, if somebody had a different use of geranobinol that they wanted to take up and ask for reimbursement, HHS would make, you know, an individual determination. But here, what HHS says is surely what it does not mean is that it's associated with any disease. Okay, but Council, that's not really, that doesn't seem like what you argued below, and it doesn't seem like what the district court concluded. It seems like what was previously argued was that this can be used to support only the application with respect to intractable nausea and vomiting related to metastatic cancer of the gastrointestinal mucosa. And that you might be broadening it now in your argument on appeal, but that's what the appeals council held below. And that seems to me to be extremely narrow. I mean, this is a one-person study. And interestingly, there are other titles in the other indications here, which are geared towards a specific use in a particular disease. This title is not. It's broad, and it speaks of, you know, use in disease in general. Why doesn't that, when we look at the whole thing holistically, why doesn't that require a broader use than simply in the specific case that this particular patient and the only patient in the study had? No, Your Honor, for a couple of reasons. First, specific to the way that the compendium, two main reasons, one specific to the compendium and the other sort of a general matter of statutory interpretation. So the one specific to compendium is that the way, and this is described in the IBM Watson document that was cited in the briefs, the way that these compendium titles are created or entries are created are sort of, they're different editorial staff, they're added at different times. And so it doesn't sort of make sense to read exactly how specific a particular title is in the same way that one would with one sort of statutory enactment. And then more broadly, even if, although HHS disagrees that this should be read like a statute and not like a medical compendium, that as the Seventh Circuit has explained, it's intended primarily for professional healthcare professionals, that even in sort of the statutory context, the title isn't supposed to be sort of the tail that wags the dog. And so here, although HHS acknowledged that read in isolation, one might think that the authority and technical competency to say, well, if it was really meant to be so broad and really supported sort of more than a sort of sliver, or if you squinted at it sideways, if it was really meant to support a broader use, then you would expect there to be a broader use in the summary or the substantive case. Well, counsel, so here's the problem that I have with that. First of all, I think that looking solely at the use in the particular study, which again, was with one patient, is overly narrow. And what it does is it renders the title surplusage. It also ignores the fact that there's a discussion about it being used for palliative care, that is to treat the nausea and vomiting. And the way that it works is not something that is specific to cancer, but that it works on the medulla to inhibit the brain receptors. And so when you think about all of those things, and you're considering all of those things, I don't understand how it makes any sense at all to be limited to use in solely intractable nausea and intestinal mucosa. No, Your Honor, and with Your Honor's indulgence, I think that there are sort of a couple of different premises to your question there that I want to make sure to address. So the first is that it doesn't render the title superfluous. Every citation, sort of reading titles generally as superfluous, every citation is read holistically, and substantial deference is due to HHS's expertise in conjunction with the substantive citation supports a particular use. And so, you know, here there's a broad title, but then everything else is very narrow, and that's, you know, perhaps a reasonable, you know, there might be a different reasonable reading, but if there are multiple reasonable readings, then it's HHS's expertise, and this Court gives it substantial deference, as for example, in the Court's recent discussion in vitreo. And then more specifically, I do want to talk, because I think something that's happened in the oral argument. I'm sorry, counsel, I just want to ask you a question about what you just said. You know, are you familiar with the Kaiser opinion from the Supreme Court, which talks about our deference, which of course is not relevant here? Yes, I am. Right, okay, and so you know how the Court was very emphatic about the need for And so, how does the purpose of the statute here, which is a remedial statute, and which is designed to provide coverage to seniors in particular for their Medicare, for their drugs, because it was costing so much for out-of-pocket costs, how is applying it in this very narrow way to one specific kind of cancer that only one patient has, how is that consistent with that purpose, and don't we have to apply that tool in the toolbox when we are determining whether the statute is in fact ambiguous? So, Your Honor, I do want to address that question. If I might just put a pin just to make sure I get to it before the end of my time has expired, I do want to address the confusion with sort of what's been said in the study that hasn't been incorporated into the actual citation and what that study says. So, I do just want to put a pin in that to say that I definitely want to return to it because I think some confusion has been introduced in the oral argument. But with respect to Your Honor's Kaiser question, you know, of course that actually, you know, we would say that that's sort of fundamentally different in that that's a question about asking for the sort of supercharged hour deference to interpretation of regulations, whereas here what we're talking about is a question. So, Congress, it's a benefits program, and absolutely benefits programs, one of their purposes is to provide remedial relief. On the other hand, it's also true of every benefits program that Congress sets limitations at certain places, and one has to look at the way that Congress set those limitations. And what Congress didn't say is, anytime one treating physician sort of personally thinks that a citation supports a use, Medicare Part D is going to pay for that. And again, that's a separate question from whether or not the doctor can prescribe the prescription in the first place. It's a question of whether- Of course, I totally agree with that, and I'm not suggesting that just because the doctor thinks that this is an appropriate use that it's covered. I fully agree with you on that. And so, but I do think it's a little bit important- it's important, too, to think about sort of the broader context of this. So, it would have been perfectly reasonable for Congress to say the only thing that Medicare Part D is going to pay for is FDA on-label uses. Congress says, we want to be a little bit broader than that, but we're not saying any off-label use. We're saying an off-label use that is supported by a citation and a medical compendium. And then they say they delegate the decision on a case-by-case basis as to whether that's true to this four-step administrative appeals process. And here, I want to point out, though not strictly necessary, at every stage of the appeals process, everyone else except for the treating physician here agreed that this sort of broader use wasn't supported. And that so I think in that context, you know, it's not enough to say sort of in the statutory toolbox, this is meant to sort of be remedial, and that's the end of the question. Oh, I agree with you. I'm not saying that that's the be-all and end-all. What I'm saying is, do we not have to account for that? And getting back to something you said earlier, I mean, we are interpreting statutory language here, right? So, since we are interpreting statutory language, don't we first have a duty to ensure that it's not ambiguous before or that it is ambiguous before we go to any... Yes, Your Honor. So, certainly the statute doesn't unambiguously say that dronabinol is a covered drug. And so the question is, does a particular citation read on a case-by-case basis, which is ordinarily a medical judgment as ordinarily a medical judgment, does that support this particular use? And again, that's based on HHS's analysis of a medical compendium. And to sort of be doing a de novo review of whether or not the Secretary's technical judgment call is correct would really, I mean, sort of not just upset the apple cart in this particular instance, but sort of be inconsistent generally with the reimbursement decisions are evaluated. You said something I was not aware of, in the administrative process, are you saying there was expert opinions about this particular disease and that this was not supported for nausea caused by this particular disease? So, right. So, there were two earlier rounds in the appeal process by the plan sponsor and independent entity. And both of those, at both stages, there were two different, at one stage, there was one doctor, at the other stage, there was a different doctor. And both of them came to the same conclusion as HHS. That's not necessary. Well, I'm asking, what was their testimony that the compendium didn't support or independent medical judgment that they made? That the citation didn't support the use of dronabinol. So, they didn't make any independent medical judgment? No, but they agreed with the... Okay, well, that confused me. All right. I apologize for that. All they're saying is the compendium doesn't support it. Right, exactly, which is the statutory requirement for reimbursement. If I might, I see I'm running really short on time. If I might just medical judgment, as opposed to when they testify, the compendium doesn't support it, as opposed to a legal judgment. So, it's a technical judgment of sort of expertise in the medical area. And so, that's why we're talking about substantial evidence review. If I might, I just see my time is running really short. And I really want to clarify the sort of question about what the study was saying. So, first of all, we would fundamentally disagree with plaintiff's interpretation, which is to go far beyond the four corners of the citation. And what's important is the four corners of the citation. And HHS explains that when you read the whole citation together, just like the FDA on-label uses for dronabinol are symptoms associated with specific diseases, so, too, this one off-label context, one off-label when you read sort of the substance citation is similarly tied to a specific, very specific context. But even if one were to look more broadly at the study, which, again, you know, we don't think is appropriate, I think it's important to not sort of read what's been cherry-picked. So, and I want to make sure that I get it right. And these excerpts are in the Tangny District Court case at 50. They're not in the administrative record. But so, what the study actually says is not that it's definitely the opiate receptors. What it says is the mechanism of the anti-emetic effect, i.e., the anti-nausea effect of dronabinol is unknown. Central action is suspected, perhaps opiate receptors in the forebrain, which inhibit the vomiting center in the medulla. So, it's certainly within HHS, would be within HHS's discretion had that been incorporated in citation to say that's simply not enough to say that it actually supports the use. And that's not to say that somebody couldn't read it differently, but that is within a completely reasonable read of that. And then, similarly, again, the study itself concludes, now, it's not just, it doesn't just talk about sort of that specific context in giving the case medical background. The study concludes with the following. Low doses of dronabinol may be safe and effective when used in combination with other anti-emetics for intractable cancer-related nausea and vomiting with no mechanical obstruction. Dronabinol should be considered a potentially useful agent in this setting. So, even this underlying study itself confirms that what HHS, how HHS read this particular citation is a completely reasonable reading of it that should be affirmed by this court. Now, I just have one more question. You mentioned the Tangley case out of the District of Massachusetts. That case doesn't really help you at all. No, that's right. And the only reason I mentioned that case was just because it has the under, if your honors do want to look at what the underlying study says, even though it's our position that it's the four corners of the citation, it has the relevant excerpts that I was just talking about. But we, of course, think that Tangley was wrongly decided, both because the court applied de novo review to HHS's determination, which as we've explained here, would be, is a startling departure. And because they essentially treated the facts that it worked for that person, they called that itself a case study, which isn't the way that case studies work in that context. Well, let me just ask you one more question. Is there anything in the record about whether or not Dronabinol is the only drug that Medicare Part D approves that will have an effect on nausea and vomiting? It can be the only drug out there. So I'm not familiar with the whole compendium, in part because it's a private compendium, so I sort of don't have access to the whole compendium. So I apologize, Your Honor. I mean, I assume that to be true, but I don't, I haven't read the whole compendium. Okay. But in any event, we've got a prescription by his physician that this is the drug that can treat this nausea and vomiting. And so even though we give more deference to the appeals council's decision, that's obviously a factor that we ought to take into consideration. No, Your Honor, I actually would disagree with that. So that, and I thank you so much for giving the opportunity to sort of clarify our position on that. So this, the question before the court doesn't go to sort of whether or not the doctor is allowed to prescribe the prescription to him that has sort of proven useful, that appears to have proven useful, Tim. It's a question of whether, it's the separate question of whether it's a medically indicated use under the Medicare Part D statute for which the federal fiscal pay. But we can factor that into consideration in determining whether or not the HHS determination is arbitrary and unreasonable. No, Your Honor. I think the, I would disagree. The question of whether a particular, unfortunately, the question of whether a particular drug works for somebody is a separate question from whether or not it comes within the benefits program that Congress has set up here. And like any benefits program, Congress has set up limits and it didn't sort of, unlike the sort of, unlike this social security disability context in which the treating physician's opinion often really is sort of the most important thing. That's not the way Congress set that up here. And we know that in part from the way they set up the administrative appeals process. So the appeals council doesn't factor into anything that the treating physician says at all? The, I mean, so as the, you know, if the treating physicians had a helpful reading of the citation they agreed with, it's not that they, you know, don't read what the treating physician says, but the treating physician's personal opinion of the citation doesn't get the same type of weight that a treating physician's personal opinion gets in a social security disabilities context. And that's just the way that Congress has set up this particular benefits program. All right. I got you. Thank you very much. All right. Thank you, counsel. And Mr. Chen, you've reserved some time for rebuttal. Thank you. If I can try to make two points in my three minutes, one legal and one sort of on the technical competency. And let me start off with a legal one with Judge Wilson's last question about the physician. Now, as a legal matter, we think this is very representative of what happened before the council. If you look at ROA 9 to 10, it makes reference to the physician letters, the treating physician letters. And it actually says those are essentially inapposite as a legal matter, because we don't look at the symptoms. We are requiring a match as a legal matter with respect to the disease. Now, the government says that that is grounded in the statute. But I don't think that you can read supported by in that way, whether or not you want to say it's ambiguous or there's some sort of deference. That's not a persuasive position to take. They think that you have to say it's holistic. And with respect to the legal rule, they have pointed to the prescription drug benefit manual. But if you actually read that, it actually says that a medically accepted indication will facilitate the diagnosis or treatment of an illness or injury. It talks about therapeutic value on the body. And I think common sense should just tell you that there should not be a rule, a legal rule that says symptoms don't matter. It has to be a disease. Common sense should tell you that drugs treat symptoms all the time. That is the point of palliative care. And what the government here has done is it has misaligned Part D coverage by saying these off-the-label uses with respect to treatment of symptoms just don't count as a legal matter. Now, the second, moving on to the technical competency. We are not asking anybody to go read the study itself. We also don't think that you need to squint sideways to see our reading at all. Now, again, I've already walked the court through the various ways in which we believe that the entire context points to a treatment of symptoms here. That is what the description is very much directed towards. It's not treating cancer. Nobody is saying here that dronabinol treats cancer. It treats a symptom of cancer, which is nausea and vomiting. And there is no question here as well that Mr. Dobson's nausea and vomiting is both disease-related and treatment refractory. They have tried everything else, all the conventional The last thing that I would say is that we are not asking for an expansion of Medicare in any way. This is a reasonably necessary drug to be prescribed for him. That inquiry is off the table already. And we are just asking for the court to do what the government failed to do, recognize that it should done, apply a holistic inquiry to the citation itself. And we think that that is done, at the very least, the council should go back and apply the legal rule. But in this case, we think the only reasonable reading of the citation holistically, again, is that it supports his use of dronabinol. Mr. Chen, I didn't want to interrupt you during your closing, but explain to me, particularly under the substantial evidence rule, she argues there were two medical opinions that the compendium doesn't support the use as a matter of medical judgment in your client's particular case. Tell me exactly what the doctor said. What is their testimony or affidavit or whatever it is? Sure. Yes, Your Honor. So two quick points. The first one is that you will not see this anywhere in the council's decision itself. You can look at ROA 8 to 10 does not reference. So I'm saying now that I'm trying to get a record question. Tell me what's in the record. Yes. So in the record, you can see it at ROA 1052. And I think this is quite telling. I think it exemplifies the legal error here. Just tell me what they said. Yes. It says dronabinol is requested. So it says we asked our physician reviewer to determine. And then this is what the physician reviewer says. It's pasted at 1052. And then the actual note, I believe, is at 1057. It says dronabinol is requested to treat a patient with nausea and vomiting related to Eagle syndrome and central cord syndrome not associated with cancer, chemotherapy or following breast surgery, which are off label non FDA approved uses. And so it is essentially saying we are just going to look at the diseases again, right? Those three categories, cancer, chemotherapy or following breast surgery. Chemotherapy is actually the FDA approved use here. And so it's not surprising that it would be specific to a disease. That's the way FDA approval works. You have a clinical trial. It's very specific. So what else did they say? That is the entirety. Oh, well, there's one more sentence. It says the Medicare approved compendia do not contain any citations to support the use of this drug for these conditions. These being Eagle syndrome and central cord syndrome. But it was disease based evidence. Correct. And again, just to be clear, what we think they have done here said we see three diseases in the compendium, cancer, chemotherapy or following breast surgery. Those correspond, of course, the cancer corresponds to the drug excitation issue here. Chemotherapy would respond to the FDA approved use and following breast surgery. You're not going to see a title that says following breast surgery. It is the compendium entry that Judge Wilson referenced with respect to prophylaxis and treatment of post-operative care. And so they've done the exact same thing. These physicians have essentially made the same legal misstep and saying this has to be. You've answered my question. Thank you. Thank you, your honors. I thank you, Mr. Chen and Ms. Lopez.